IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RAMI COLWELL,

       Plaintiff,

vs.                                                                                  Civ. No. 05-450 WJ/RHS

LESLIE JOHNSON, in her
personal capacity and
under color of state law, and
TONY HALPAIN, in his
personal capacity and
under color of state law,

       Defendants.

**MEMORANDUM OPINION AND ORDER**
**DENYING SUMMARY JUDGMENT**

THIS MATTER comes before the Court upon Defendants' Motion for Summary Judgment, filed January 10, 2006 **(Doc. 35)**.  This lawsuit arises from an incident which occurred during the time Plaintiff was incarcerated in the Eddy County Detention Center from August 2004 until October 2004.  Plaintiff alleges that Defendants violated her Eighth Amendment rights under the United States Constitution pursuant to 42 U.S.C. § 1983 as a result of an alleged sexual assault which happened on or about September 7, 2004.  Having considered the parties' briefs and the applicable law, I find that Defendants' motion is not well-taken and will be denied.

**Background**

Plaintiff alleges that during her incarceration, she learned of some improper contact between a corrections officer employed by the Detention Center and a female inmate.  Plaintiff alleges that after she reported the matter to Eddy County Detention Center personnel, she was

beaten and raped in her cell in retaliation for her report.  Plaintiff alleges that when she informed on the improper conduct of a corrections officer and an inmate, Defendants were deliberately indifferent to the risks that existed to the Plaintiff, and failed to take reasonable measures to protect her.  As a result, Plaintiff was sexually assaulted, thereby violating her Eighth Amendment rights under the United States Constitution.  Defendant Leslie Johnson is the warden, or Chief Administrative Officer of Eddy County Detention Center.  Defendant Tony Halpain is a supervisor of the corrections officers.

Although the Complaint asserts a violation of Plaintiff's rights under the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983, the Court must construe Plaintiff's claim as brought under the Eighth Amendment.  County of Sacramento v. Lewis, 523 U.S. 833 (1998) (where plaintiff based § 1983 claim on Eighth, Thirteenth and Fourteenth Amendments, only the Eighth Amendment provided the appropriate framework for analysis) (citing Graham v. Connor, 490 U.S. 386, 393 (1989) (if covered by a specific constitutional provision, claim must be analyzed under the standard appropriate to that specific provision); Barney v. Pulsipher, 143 F.3d 1299, 1310 (10th Cir. 1998) (claims concerning conditions of confinement remain bounded by the Eighth Amendment, the "explicit textual source of constitutional protection in the prison context").  The Complaint is not incorrect so much as insufficiently specific, since the Eighth Amendment is made applicable to the States by the Fourteenth Amendment. See, Estelle v. Gamble, 429 U.S. 97, 102 (1976).

A more detailed chronology of events follows, based on the undisputed facts, unless otherwise noted.  Because Plaintiff does not dispute any of Defendants' statement of undisputed

facts ("SMF"), the Court deems those facts admitted by Plaintiff.[1]

On August 16, 2004, Plaintiff Rami Colwell was incarcerated in the Eddy County Detention Center after being convicted of misdemeanor charges. Sometime thereafter, Plaintiff was housed in the female housing Unit known as Beta 2, Cell 193 of the Eddy County Detention Center ("detention center"). On September 7 and 8, 2004, Plaintiff was the only person housed in Beta 2, Cell 193. Three locked metal doors stand between Plaintiff's cell and the main hallway of the detention center. The main hallway leads to Beta Pod vestibule, which in turn leads to the hallway leading to Plaintiff's cell. In addition, in order for a person who is not on duty at the detention center to enter the main hallway, that individual must pass through at least four locked metal doors. Each of these doors can be unlocked either electronically by a corrections officer in the Control Room of the detention center, or by a key.

Multiple keys are needed to open all of these doors. These keys are kept in the Control Room, which itself is locked and requires the Control Officer to allow entry, so that access to the keys is strictly limited. The door leading from the main hallway to the Beta Pod vestibule is visually monitored by the corrections officer on duty in the Control Room. The door, which is less than 25 feet from the Control Room, is visible to the corrections officer in the Control Room through a large glass window.

On or about September 3, 2004, Plaintiff reported to one or more employees of the Eddy County detention Center that she had information that a female inmate and a corrections officer,

---

[1] Under D.N.M.LR.-Civ 56.1(b), the nonmovant in a summary judgment motion is required to "refer with particularity to those portions of the record upon which the opposing party relies, and must state the number of the movant's fact that is disputed." Unless specifically controverted – which Plaintiff has not done here – those facts will be deemed, and therefore are deemed, admitted.

Mike Mitchell ("Mitchell"), were having inappropriate contact with each other. Plaintiff complied with a request to put the report in writing. Defendant Johnson ("Johnson" or "Warden Johnson") was made aware of the situation. The detention center began an investigation into the allegations. In the course of the investigation, the Lieutenant who was performing the investigation limited the number of persons who knew about the investigation. During the investigation, Mitchell was initially assigned to an area of the detention center away from the female inmates, and then suspended after evidence was gathered that tended to support the Plaintiff's allegations against him. Mitchell did not work in the detention center on September 7 or 8, 2004.

On September 7, 2004, Corrections Officer Nancy Thomas locked the Plaintiff in her cell (Cell 193) by herself at approximately 11:00 p.m. On September 8, 2004, about 1:00 a.m., Plaintiff depressed the intercom button in Cell 193 to summon help. Detention officers who arrived at her cell found Plaintiff with her hands and feet bound, and gagged. After Corrections Officers arrived at her cell, Plaintiff alleged that she had been beaten and sexually battered in her cell sometime between approximately 11:00 p.m. on September 7, 2004 and 1:00 a.m. on September 8, 2004, after lockdown. Plaintiff cannot identify any of her alleged assailants.

## Discussion

Defendants contend that they are entitled to qualified immunity on Plaintiff's claims.

**I.      Legal Standard**

When a defendant raises a claim of qualified immunity, the burden shifts to the plaintiff to show the defendant is not entitled to immunity. Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001). To overcome a qualified immunity defense, a plaintiff must first establish a violation of a

constitutional or statutory right and then show that the right was clearly established. <u>Garramone v. Romo</u>, 94 F.3d 1446, 1449 (10th Cir. 1996). Only if a plaintiff has alleged a deprivation of a constitutional right does the Court consider whether that right was clearly established at the time so that reasonable officials would have understood that their conduct violated that right. County of Sacramento, 523 U.S. at 841, n. 5; <u>Trotter v. The Regents of the Univ. of New Mexico</u>, 219 F.3d 1179, 1184 (10th Cir.2000).

If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity. <u>Albright v. Rodriguez</u>, 51 F.3d 1531, 1535 (10th Cir.1995). If the plaintiff meets her burden of coming forward with facts or allegations which would demonstrate that the defendant's alleged violation should have been apparent in light of preexisting law, then the defendant assumes the normal summary judgment burden of establishing that no material facts remain in dispute that would defeat its claim of qualified immunity. <u>See</u>, <u>Woodward v. City of Worland</u>, 977 F.2d 1392, 1396-97 (10th Cir. 1992). Specifically, the public official must show that no material issues of fact remain as to whether his or her actions were "objectively reasonable" in light of the law and the information he or she possessed at the time. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). In determining whether summary judgment is appropriate, the Court considers the facts and all reasonable inferences drawn therefrom in a light most favorable to the nonmoving party. <u>Hollander v. Sandoz Pharmaceuticals Corp.</u>, 289 F.3d 1193, 1214 (10th Cir.2002).

**II.     Whether Plaintiff Has Asserted a Violation of a Right Secured by the United States Constitution**

Defendants contend that Plaintiff has failed to demonstrate any violation of a

constitutional right. In the complaint, Plaintiff alleges that Defendants knew or should have known of the vulnerability of the Plaintiff to retaliation after making a written report which attested to illegal behavior of a corrections officer, and should have taken measures to insure the confidentiality of the statement and to insure the safety of the Plaintiff. Complaint, ¶ 14.

A.   Eighth Amendment Standard

The Eighth Amendment requires that prison officials are responsible for taking reasonable measures to insure the safety of inmates. Farmer v. Brennan, 511 U.S. 825, 832-33 (1994); cited in Lopez v. LeMaster,172 F.3d 756 (10th Cir. Okla.). In asserting a claim brought under the Eighth Amendment, a plaintiff must show that she is incarcerated under conditions posing a substantial risk of serious harm. In addition, Plaintiff must sufficiently allege facts which show that Defendants had a "sufficiently culpable state of mind," i.e., one of deliberate indifference to the inmate's health or safety. Riddle et al v. Trevino et al, 83 F.3d 1197, 1204 (10th Cir. 1996).

In Wilson v. Seiter, 501 U.S. 294 (1991), the United States Supreme Court clarified that the Eighth Amendment's deliberate indifference standard has two components: an objective component requiring that the pain or deprivation be sufficiently serious; and a subjective component requiring that the offending officials act with a sufficiently culpable state of mind. Id. (discussing Estelle v. Gamble, 429 U.S. 97, 106 (1976); Miller v. Glanz, 948 F.2d 1562, 1569 (10th Cir. 1991).

Thus, in alleging a violation of her Eighth Amendment rights in the context of her complaint, Plaintiff must sufficiently allege facts showing that she is incarcerated under conditions posing a substantial risk of serious harm, and that Defendants acted with deliberate indifference to her safety.

B.     Facts Alleging a Substantial Risk of Serious Harm

Plaintiff presents a "statement of undisputed facts," many of which Defendants concede are undisputed, but which Defendants believe are immaterial or incomplete. The Court does not totally agree with this assessment. Many of these facts, supported by deposition or affidavit testimony, relate to Defendant's awareness of Plaintiff's situation as well as the reasonableness of their conduct, and thus are material as well as relevant. In addition, these facts offer a plausible alternative to what Defendants imply: that Plaintiff bound, gagged and injured herself.

Plaintiff became aware of the relationship between Mitchell and the female inmate while she worked as a trustee in the laundry room at the detention center. She testified that Mitchell and the inmate would tell her to keep an eye on the door while they were together. Plaintiff observed them fondling each other, but did not observe them when they went behind the dryers. She stated that this occurred several times a week, even on Mitchell's week off. Pltff's Dep. at 75-80.[2]

Defendant Sargeant Tony Halpain ("Halpain"), who was Mitchell's shift supervisor, denied knowing about either the inappropriate relationship or the fact that Plaintiff informed his superiors about the relationship. However, taking Plaintiff's version as true, there is evidence which disputes Halpain's representations. According to Plaintiff, on September 2 or 3, 2004, she became engaged in a verbal exchange with Halpain, following an altercation Plaintiff had with another inmate who also worked in the laundry. Halpain threatened to take away Plaintiff's trustee status because of the altercation. At one point in this conversation, Halpain questioned

---

[2] Plaintiff's exhibits are not designated by either number or letter, and will be referred to by the nature of the exhibit. Defendants' exhibits are designated by letter, and will be referred to by letter.

Plaintiff about how much she had seen about "what was going on in the laundry room." Plaintiff then told Halpain about the relationship between Mitchell and the inmate. Pltff's Depo at 73; Defts' Ex. C at 83:18-22. Mitchell and the female inmate were in the laundry room when Plaintiff returned there. Mitchell left shortly thereafter, then returned 15 or 20 minutes later. He told the female inmate that he would not be coming down there as much, and that there was a "snitch" who had just talked to Halpain about the relationship. Pltff's Dep. at 80. Plaintiff stated that she believed Mitchell suspected her of being the informant, although Mitchell said nothing.

Prior to her disclosure to Halpain about the relationship, she had not told anyone else in the institution about it. However, there is evidence that at least two other guards were aware of the relationship between Mitchell and the female inmate. Rodriguez Dep. at 8; Johnson Dep. at 48. Further, one of the guards testified that it was common knowledge among those working the shift that Mitchell and Halpain were good friends. Rodriguez Dep. at 9. This evidence is sufficient to raise inferences not only that Halpain knew about Mitchell's conduct with the female inmate, but even that Halpain communicated with Mitchell about Plaintiff's knowledge about the relationship.

In recalling the attack and rape, Plaintiff stated that she felt pressure initially on her lower back and shoulders from what seemed to be more than one set of hands. She remembered that her arms were grabbed, and tied behind her back her head was jerked back, and that something was stuffed in her mouth. After something was placed over her head, she heard someone say in a whisper that she "asked for it." Pltff's Dep. at 144-45, 152. The prison guards who responded to Plaintiff's summons for help found Plaintiff gagged, with her wrists and ankles bound, looking "pretty beat up. Voss Dep. at 8; Burns Dep. at 7-8; Bradley Dep. at 15. One officer testified

that he had to cut Plaintiff's hands free because they were bound so tightly. Burns Dep. at 7. The medical assessment conducted at the hospital to which Plaintiff was taken indicates that Plaintiff was left with a swollen eye, bruises on her back and wrists, and lacerations and bruises in her vagina.

     Defendants attempt to rebut several of Plaintiff's facts by reasserting that the keys necessary to open the doors leading to Plaintiff's cell were locked up and not available to anyone, and that a corrections officer inside the Control Room would have had to agree to open the doors. Also, Defendants concede that off duty officers usually enter the detention center from two outside doors to check their schedules or pick up pay checks, but note that departure from these areas to the areas where inmates are housed would be considered an irregularity subject to being reported to a supervisor. It is fair to say that Defendants' facts regarding the security of the detention center support the unlikelihood of male inmates gaining access to Plaintiff. However, Defendant's rebuttal leaves room for other facts supplied by Plaintiff suggesting that it would be difficult, but not impossible, for a guard or off duty officer to gain entry into the detention center and inmate area for the purpose of harming Plaintiff in retaliation for her report. Plaintiff's recollection of there being more than one person inside her cell would be consistent with such a scenario.

     Viewing the facts favorably to Plaintiff, there is sufficient evidence to establish that Plaintiff was placed in a substantial risk of serious harm after informing on Mitchell and the female inmate. Plaintiff relayed information concerning an inappropriate relationship between a prison guard and a female inmate which would likely result in the guard's termination; certain facts infer that Halpain could have known not only about that relationship, but also that Plaintiff was the

informant.

Plaintiff offers the deposition testimony of her expert witness, Michael Hackett, a former Jail Administrator. Mr. Hackett testified that the locks on the metal doors are not a fail-safe system in that inmates have ways of voiding these locks even when they are properly locked electronically. He opined that once Plaintiff became an inmate informant, she was put in danger and should have been placed in protective custody, whether or not it was requested. He also noted that Plaintiff's seemingly remote housing situation was actually less secure than if she were housed in the booking area where more staff was present.

A jury could infer from both the undisputed facts and additional material facts presented by Plaintiff that Plaintiff's safety would be jeopardized after she informed against a corrections officer, and thus that she was incarcerated under conditions posing a substantial risk of a serious harm. Plaintiff relayed information concerning an inappropriate relationship between a corrections officer and a female inmate which would likely result in the corrections officer's termination; certain facts infer that Halpain could have known not only about that relationship, but also that Plaintiff was the informant. In addition, there is evidence that the detention center had experienced a similar incident in 2001 when a prison guard had sexual intercourse with a female inmate (hereinafter, the "Villegas incident"). That corrections officer was fired, and the inmate was transferred to another facility. Barnes Dep. at 27-28. Danger of retaliation by the corrections officer (or even the female inmate with whom the corrections officer was having the relationship) would exist particularly if the corrections officer would probably face termination as a result of this conduct.

Viewing the facts favorably to Plaintiff, there is sufficient evidence to establish that

Plaintiff was placed in a substantial risk of serious harm after she informed on Mitchell and the female inmate.

B.      Facts Alleging Deliberate Indifference

As part of the requirement that Plaintiff sufficiently allege the violation of a constitutional right, Plaintiff must also show that Defendants acted with deliberate indifference to her safety. The mere fact of assault does not mean a constitutional violation occurred.  Hovater v. Robinson, 1 F.3d 1063, 1068 (10th Cir. 1993).  Prison officials are responsible for those harms, that with reasonable safety measures, could have been prevented.  Farmer, 511 U.S. at 833-34.

Plaintiff contends that she was put at risk of serious harm following her report of a correction's officer's misconduct, and that she should have been immediately transferred from the facility, or at least placed in a segregated cell.  It is undisputed that, following her report of Mitchell's relationship with the female inmate, Plaintiff was not transferred to another facility, or to an area of the detention center designated as protective custody, according to the Inmate Location Roster for that time period.  Defendant claims that Plaintiff was moved from a hallway cell to the Beta 2 cell after she made the report, specifically for her protection.  Johnson Dep. at 32; Pltff's Ex. 1A.  The Inmate Location Roster indicates that Plaintiff was housed in Beta 2, Cell 193 on September 3, 2004, the same day Plaintiff lodged the written complaint against Mitchell and the female inmate, but does not go further back in time from that date. Thus, the Roster does not indicate whether Plaintiff was moved on that date before or after the assault occurred.  Nor does it offer any basis to determine whether a transfer to Beta 2, Cell 193 was as secure as placement in a segregated cell.

Defendant Johnson stated that segregation of the inmate is an option where an inmate

alleges misconduct on the part of a corrections officer. Johnson Dep. at 29:16-19. Although Defendant Halpain disavowed any knowledge of either Mitchell's misconduct or Plaintiff's reporting of that misconduct, Halpain testified that had he known that Plaintiff made that claim, he would have "absolutely" recommended segregation or reclassification of Plaintiff, and that in such situations, inmates would be housed in another facility. Halpain Dep. at 48-49. As mentioned above, Plaintiff's expert opined that Plaintiff should have been placed in protective custody whether or not it was requested.

Defendant's two-day delay in retrieving the video surveillance tape of the entries to the jail on the night of September 7th to 8th is somewhat disturbing. McCarty Dep. at 19. Defendant's sluggishness in responding to an investigation of the assault would not be directly related to prevention of the assault, but it could reflect on Defendant's general state of mind concerning the safety and security of inmates. Plaintiff presents facts which raises questions regarding the security of Plaintiff's housing location with regard to off-duty corrections officers, and whether Mitchell received his suspension as a result of the investigation after Plaintiff's assault. Defendants note that a corrections officer's movement from off duty areas to the areas where inmates are housed would be considered an irregularity subject to being reported to a supervisor. This fact does not resolve the inferences raised by Plaintiff, since Halpain was himself a supervisor whose involvement in this incident is questionable.

Based on the foregoing discussion, Plaintiff has raised factual issues regarding whether Defendants acted with deliberate indifference in not segregating, reclassifying or transferring Plaintiff after she reported Mitchell's misconduct. Thus, Plaintiff has sufficiently alleged a violation of a constitutional right under the Eighth Amendment and in so doing, has met the first

part of overcoming Defendant's qualified immunity defense.

### III.     Whether Defendants Are Entitled to Qualified Immunity

At the time of the underlying events giving rise to this litigation, it was clearly established that the Eighth Amendment requires prison officials to "provide humane conditions of confinement," which includes taking "reasonable measures to guarantee the safety of inmates." Farmer, 511 U.S. at 832.

As I have discussed above, Plaintiff has alleged facts sufficient to show that the Defendants violated the law.  Thus, in order to receive a favorable ruling on qualified immunity, Defendants must show there is no genuine dispute of material fact which would preclude a finding that their actions were objectively reasonable in light of the law and the information they possessed at the time.  Hinton v. City of Elwood, 997 F.2d 774, 779 (10th Cir. 1993); Liberty Lobby, Inc., 477 U.S. at 249.

The mere fact of an assault does not mean that a constitutional violation has occurred. Hovater v. Robinson, 1 F.3d 1063, 1068 (10th Cir. 1993).  However, prison officials are held responsible for those harms that, with reasonable safety measures, could have been prevented. Farmer, 511 U.S. at 833-34.

Defendants' position that they acted reasonably in securing Plaintiff's safety following her report is untenable in light of certain factual evidence presented by Plaintiff: that Halpain and Mitchell were friends; that Mitchell may have discovered that Plaintiff reported him to his superiors, and may have discovered this from Halpain; that in a previous similar incident at the detention center, the inmate who report misconduct had been transferred to another facility; and that off-duty corrections officers may have had access to Plaintiff's Cell 193, albeit with some

13

difficulty but not impossible with some help from another corrections officer. Accordingly, I find that Defendants are not entitled to qualified immunity on Plaintiff's Eighth Amendment claim.

## IV. Plaintiff's Claims of Municipal Liability

Plaintiff alleges her claims against Defendants in both their individual and official capacities. An action filed against a state official in his or her official capacity is simply another way of pleading an action against an entity of which an officer is an agent. Kentucky v. Graham, 473 U.S. 159, 165 (1985). In this case, Plaintiff is alleging claims of municipal liability against Eddy County.

A plaintiff suing a municipality under section 1983 for the acts of one of its employees must prove:(1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation. See Monell v. Department of Social Services, 436 U.S. 658, 694 (1978), cited in Myers v. Okla County Bd. of County Commissioners et al., 151 F.3d 1313, 1320 (10th Cir. 1998).

One of the corrections officers deposed[3] stated that the detention center had no policy concerning what to do with an inmate who makes an allegation against a corrections officer, nor was there a change in any policy following the Villegas incident in 2001. Barnes Dep. at 28. Plaintiff's expert Hackett questioned why Warden Johnson failed to make the same call the Eddy County administration made in the Villegas incident, and thought that the staff should have been given specific training subsequent to that incident, although Hackett did not know whether staff had been given this training or not. Hackett Dep. at 121.

---

[3] The Court is left to assume that Dean Barnes is a corrections officer, since Plaintiff does not identify Mr. Barnes.

Given the factual questions regarding what training, if any, staff was afforded for situations involving inmate informants, and what policy or custom guided staff action in such situations, I find that Plaintiff's Eighth Amendment claim against the County should proceed to trial.

## Conclusion

Plaintiff has satisfied the two-part inquiry of a qualified immunity analysis for an Eighth Amendment claim. Defendants are not entitled to qualified immunity because they have failed to show that their actions were objectively reasonable in light of the law and the information they possessed at the time.

**THEREFORE,**

**IT IS ORDERED** that Defendants' Motion for Summary Judgment **(Doc. 35)** is hereby DENIED for the reasons set forth in this opinion.

_____
UNITED STATES DISTRICT JUDGE